Good morning, Your Honor. May it please the court, counsel. As the court knows, my name is Jack Peacock, and I represent Mrs. Lombardi, along with my partner, Mr. David Variecky, who will be doing the rebuttal portion. I know that the court typically has read all the briefs beforehand, so I won't spend very much of my time talking about the facts. Mrs. Lombardi and her husband took out a loan and bought the property that's the subject of this case, which, of course, was their homestead, and her husband died in 2012. We've got the facts down, Mr. Peacock, so why don't you just move to your legal arguments. Okay. You can refer to the facts as you need to. All right. Well, the only other item that I would kind of want to give the court a little bit of a timeline that might be helpful. In 2012, on May the 7th, the loan was accelerated, and in June and July, well, June and July, she submitted a request for a loan modification with Bank of America. And in August, supplemented the request for the modification not once but twice, and then in September, September 12th and the 13th, she again submitted additional documents that Bank of America wanted. And in October, again submitted and completed everything. By October 26th, 2012, everything was completed. But Bank of America foreclosed on November 6th, 2012. So I think that the issue here, and the court has developed a body of law now on abandonment of acceleration, starting with Boren, the Boren case. So let me, I don't mean to interrupt your train of thought, but so you're claiming now on appeal abandonment of acceleration. But in the district court, you claimed waiver of acceleration, which is something completely different. Normally, you can't raise a new theory on appeal. Well, okay. Let me answer the court's question. In 2013, all of these pleadings were done, and this was before the Boren case. All right. And as the court well knows from Boren and other cases, that waiver and abandonment have the same elements. And so it only recently has there been a body of law that says that abandonment and waiver are different. That has never, ever been the case in Texas law, ever, until recently. There's been, and all of that happened after our pleadings were closed. So when we said waiver, we were saying temporary waiver. We were not saying that there was a future or a waiver, a permanent waiver of a right, a temporary waiver of the acceleration. Same thing as an abandonment of the acceleration. So that's why you see it that way. It's not a new theory that we're bringing to this court. We don't see it that way. We see it as the same theory, but the words back in 2013 were interchangeable. Waiver of acceleration and abandonment of acceleration, and the court will note that, that in every case, you'll see it either one way or the other, but it meant the same thing. Only in the last two years has that changed. Okay. Now. Did it change while this case was still pending? In other words, had there been final judgment in the district court at the time this changed? I can't remember when the actual final. I want to say the final judgment in this case was 2015. I can look it up in the record, but I'm thinking it was 2015, the final judgment regarding Bank of America. They might have been out in 14. Anyway, Boren came in 2015, the Boren case, and it was shortly after that we start seeing a difference in the meaning of abandonment of acceleration and waiver of acceleration. It was after that, it was the very first time that anyone started seeing that. Okay. So I want to point out one other thing that I think is significant here, and Your Honor opined on the DeFranceschi case that came out, DeFranceschi v. Soteros, came out in April. The court may recall from that case that in the trial court, summary judgment was rendered against Mr. DeFranceschi on the issue of limitations because the court found that the limitations had been abandoned or waived, that the acceleration had been abandoned or waived by the fact that he had made a loan modification request. That was the basis for the court's decision in granting summary judgment in favor of the lender. That's exactly what we have here. Now, on appeal, the court will recall that the court noted that but also said, well, there was also some letters of default that were sent, and so kind of just nailed it down with that. But it's identical to the DeFranceschi case, the way it was decided in the trial court. Okay. So we contend that based on this new line of cases that has come out since Boren, that Bank of America waived acceleration by going forward with – now, Bank of America's argument is, well, how can we do all this? We have to comply with the federal regulations regarding servicing requirements, and at the same time, we're required to protect our investors by promptly foreclosing. But as the court knows now, and really even then, but now there's the CFPB regulations that specifically say that a lender cannot double track, and that's exactly what they were doing there, and that's prohibited by the CFPB now. So that's not really a very good excuse on the part of Bank of America that, well, we have to comply with all of this. No. They can process the loan modification. If the person doesn't qualify, they can send out their letter of denial, and then they can go forward with their foreclosure process. But here, what they did was they led her along, send this, send that, send this. How many times? I count, what, eight times between the time of the acceleration and the time of the foreclosure. Now, that should be plenty to form the basis of an abandonment of the acceleration. All right. Now, or let me hasten to say that at least it raises a fact issue, and it has always been the law until recently, the Texas Supreme Court has taken the position in the Holy Cross case and other cases that whether acceleration was abandonment is a fact issue, if the basis was abandonment by implication rather than by agreement. Now, quickly moving to the MEWIC matter. Now, as the court will note from our brief, it's unclear whether the court even had jurisdiction of the MEWIC matter because it's an LLC, and if one of the members was a Texas resident, then there's no jurisdiction. There's no diversity jurisdiction. And that was never conveyed to the court. And as a matter of fact— But you amended to add a federal claim to the case. Well, the basis of—well, we added federal claims, but I don't recall whether we added a federal claim against MEWIC. That I don't remember. I just don't remember that for sure. But the basis for federal jurisdiction was diversity. So anyway, but moving on from that, two things I want to point out about the MEWIC matter. As we stated in our brief, they don't qualify as an innocent purchaser for value for the simple reason that Mrs. Lombardi was still living at the premises, and that's constructive notice. And whenever there's constructive notice, then they can't be an innocent purchaser for value. Now, does that mean that they automatically lose? No, but it does raise a fact issue. There's a fact question there now. So they don't prevail as a matter of law, or at least they shouldn't. On the other issue that we raised with MEWIC was on the award of 31 months of rental value to MEWIC against Mrs. Lombardi. Now, I have submitted a copy of the statute for each of you to have in front of you. As you recall from the trial court's order, the trial court at first found that all these damages were correct because it was a trespass case. Well, we pointed out to the court, no, no, Your Honor, it wasn't a trespass case. Their claim from the get-go was trespass to try title, which is purely statutory. We pointed that out to the trial court, and in our motion for reconsideration, we pointed it out again. And interestingly, the court said, well, in the court's order denying our motion for reconsideration, the court said that, well, in the court's view, Section 22.021 of the Property Code, subsection B, was inapplicable. Well, of course, we planned the whole thing, not just that, but we believed and still do believe that B2 is applicable. But even if it's not, Section D certainly is. So what does all that mean? Well, if you look at subsection B, it says, in estimating values of improvement, and the court says, well, there was no improvements here. But then it says, or of use and occupation, that was the issue. You go to 2, subsection 2, use and occupation is valued for the time before the date the action was filed that the defendant was in possession of the property. But excluding the value of the improvements. Okay. In my view, the way that this is drafted, and I believe that we all have a duty to, in statutory construction, to read the entire act, I believe that B and D can be read together. There's no conflict there. D just simply limits that time period to two years. It can't be more than two years. In my view, that's not complicated. So we believe that the court erred with dismissing the claims against Bank of America and finding judgment for Emmy Wick for 31 months of rental. And we believe that their claim to title is suspect because they can't be an innocent purchaser for value. So there's a fact issue there. And it looks like I'm running out of time. Yes, but your side has saved time for rebuttal. Thank you, Mr. Peacock. Thank you, Your Honor. Mr. Hanson. Good morning, Your Honors. May it please the court, counsel. Tom Hanson with McGlinchey Stafford on behalf of Appalachian Bank of America and Bank of New York Mellon as trustee for the investment trust. Mr. Cockrell is here representing EMI and Wick, and we've agreed to split our time evenly. I hope to finish early, but we shall see. I'm speaking on the issues pertaining to my particular clients, which are issues three, four, and five that were delineated in appellant's brief. Issue three is the waiver claim that Judge Smith was questioning counsel about. And to answer some of the answers that you just heard from Mr. Peacock, the first statement he made was that Boren was the first time that we had this notion of abandonment of acceleration under Texas law. That's simply false. This court did not invent the notion that a lender may abandon acceleration. It based it on longstanding Texas law. And even the equation of abandonment to principles of waiver, if you read Boren, it cites to longstanding Texas law for that point. So the notion that this is some newly interpreted Texas law that Mr. Peacock didn't have the opportunity to argue to the district court is simply false. It's an old argument. It just wasn't made in the district court, and so it's been waived. He also cites in his reply brief to the Lifemark case in which it was noted there's an exception to the waiver principle where, and I think the exact quote is something along the lines of, the argument's not waived if it was presented to the district court in such a fashion that the district court could rule upon it. I don't disagree with that statement of law, but Appellant simply fails that test here at every opportunity in the district court. Her original state court petition, the amended complaint after removal, the response to our motion to dismiss, even the objections to the magistrate judge's recommendation and report in which she had specifically identified the argument as waiver of a future right to accelerate, at no point did he say, wait a minute, I'm not arguing waiver of a future right to accelerate. I'm arguing waiver of a past acceleration. And that's really the key distinction here. What he argued in the district court was a waiver of a future right. What he's arguing now is a waiver of a prior act. And as I think Judge Smith noted during counsel's argument, those are two completely different things. So I think he has waived that argument, even if— Mr. Peacock says they have the same elements, so it may not matter. I disagree with the notion that simply because the same elements may be at play, that that means that it was an argument that was raised to the trial court. And quite frankly, even though abandonment is tasked in terms of principles of waiver, and the notion of conduct inconsistent with is certainly part of both, but when you apply it to a future event, you talk about, are you engaging in conduct that is inconsistent with what the contract gives you the right to do? And so it's a future right, and of course, as the district court noted, in that context the issue was, well, there's an anti-waiver clause in the contract itself. And so this notion that we've engaged in such conduct, waiving a future right, is belied by the contract itself. If the argument is, no, you've taken conduct inconsistent with what you've done in the past, that to me is a different question. Same element. I don't disagree, but the—I'm trying to think of my conjugation rules. Sort of the subject at the end of the sentence is different. It's a future right versus a past act. And I think that that makes an incredible amount of difference in terms of whether the district court had the ability to rule on it. In this case, the district court simply did not, but neither the magistrate judge nor the district judge in adopting the magistrate judge's R&R had the opportunity to rule on the question that he's now presenting to this court. So in that context, I think it's been waived. Even if it had not been, there's no basis on which to say that working with a borrower post-acceleration to try to achieve loss mitigation or a loan modification constitutes conduct inconsistent with the prior acceleration. No case has held that. He referred you to the DeFrancesi case. I think he overstates the point about the loss mitigation efforts. And what Mr. Peacock did mention and what was really what the court was focused on was the fact that the lender had sent out subsequent notices of default seeking less than the total amount due. And that's boring. That's what boring determined was that when you demand less than the total amount due after acceleration, then you've abandoned it. We don't have those facts here. And if you think about it, the notion that a lender post-acceleration abandons acceleration any time that it engages in any sort of loss mitigation activity with the borrower is, I think, drastically against public policy. Oftentimes, as I'm sure your honors know from the many foreclosure cases that come before you, borrowers don't really get serious about loss mitigation until the acceleration and notice of sale goes out. And if the rule is now going to be that a lender has to re-accelerate, and it's not just re-accelerate, but also provide a re-notice of acceleration and add time, obviously there's a chilling effect there, which runs directly counter to the mortgage servicing rules that the CFPB has now promulgated. They were not in effect at the time that Ms. Lombardi was going through her process with the bank, but the point is not that there was double tracking. The point is whether the loss mit activity constitutes conduct inconsistent with having previously accelerated the loan. It simply doesn't. Quite frankly, we could have put on evidence of that had the argument been made in the district court, but it wasn't. That's the waiver point. I'll briefly touch on the TDCA issues. The first point on the TDCA, as I think Mr. Peacock has acknowledged in his briefing, is if the waiver issue applies or if we properly foreclosed, that's the basis of his TDCA claim. This isn't a case where there was harassing phone calls or things of that nature. His argument is simply we foreclosed when we didn't have the right to. Well, if we had the right to foreclose, which we did, then that TDCA claim goes away. The second aspect of the TDCA claim, which is the third-party debt collector portion of the claim, Bank of New York Mellon, which is the defendant against which that is stated, the evidence in the record is that it was the owner of the note the entire time, at all times relevant. In his reply brief, Mr. Peacock cites to the assignment of the deed of trust. As I'm sure your honors are aware, the deed of trust is not the debt. It's the security instrument. And the evidence in the record, and we've cited it in our brief, is that Bank of New York Mellon was always the owner of the debt. It was collecting its own debt. The debt was not in default when Bank of New York Mellon acquired it. The last point I want to touch on is the violation of the Texas property code. In Mr. Peacock's reply brief, he casts it as a contractual interpretation issue. Of course, that's not the claim he brought. He brought a violation of the Texas property code. The Texas property code as well as the provision of the deed of trust that he now says is the basis of his claim have both been somewhat exhaustively interpreted by various courts, both federal and state. Not a single one has found that you need to state the specific amount due in your notice of default to comply with either the deed of trust or the property code. And with that, I'll conclude. Thank you, your honors. All right. Thank you. Mr. Cockerell. Good morning, your honors, members of the court. Please counsel Perry Cockerell for the EMI. EMI purchased this property, as you know, during litigation and was not able to evict Mrs. Lombardi because it was abated in the JP court based on that first amended petition. And that first amended petition is the one that alleged to that federal RESPA claim. The Haas decision from the fifth court seems to be so close to this one. The court noted that that was the sole federal claim in that particular lawsuit, and a lot of these bank cases involve multiple, multiple causes of action that are brought forward and remanded, I mean, and removed to federal court. So while diversity jurisdiction was based in the original complaint, the first amended complaint really was a federal question complaint, although it alleged diversity jurisdiction. It was my mistake. I didn't realize an LLC was based on members. I thought it was based on the incorporation of the LLC. But nevertheless, it was never questioned, and the appellant had the closing file, so it knows who the members are because the members had to buy the property. I mean, the LLC bought the property. Nobody raised this for the next five years. There's eight opinions written, all of which the judges and the magistrate rule that they had jurisdiction over the complaint. And if that were an issue, he could have done something a long time ago to set aside this at the trial court level. And so I don't believe it's genuine to argue that they don't know who they are because they do know who they are. They received the closing file, and they could have attacked at any time. I do believe that the cases from this court that say when a case is removed and when the removal facts are not challenged, that you can waive that claim. Nobody is suggesting that subject matter jurisdictions ever admitted, but if diversity facts are not contested at the time of the removal, then that is an assent to the truth of them. And that would seem to be the same argument you'd say when somebody intervenes in a suit and nobody objects, as in this case they did not object, and the court magistrate found that the intervention was well taken. Nobody has since done that. And then they raise it in their appellate's brief, but they really don't go into it. In their summary of argument, they don't even make that part of their summary argument, although they made it their first issue in the case. So I don't think the court needs to go down the road of examining whether there were diversity facts, whether it should take judicial notice, we could provide, or any of that. I think the Haas case is dispositive, and that's the end of that. And that is the fair way to do it, because otherwise the trial judge, magistrate, they have ruled for five years on this case with eight opinions, with this issue never being raised. And then, based on the federal complaint, once we intervened in the lawsuit, our counterclaim was compulsory because his suit was a trespass, her suit was a trespass to try title, action to quiet title, and therefore our claim for Triple T was a compulsory counterclaim that required no independent jurisdiction. Now, the argument that the counsel made that EMI is not a good faith purchaser was not made at the trial court level because he never admitted his complaint to ever make a claim against EMI, ever. But the case law is quite clear that the burden of proof, since title was in the name of EMI, the burden to prove that you're not a BFP is not on EMI, it's on them. It is on that party seeking to upset that status. And that was not made, so I don't believe that issue is before the court. I don't believe there's any claim involving title, I'm sorry, against EMI in this lawsuit. It is not in their issues. What they're wanting is to reverse the damaged claim. I do not believe, and neither did the trial court, that that statute has any application in this case. It doesn't even apply. That is a statute that is when somebody buys property and they ultimately do not have title, and they own it and they've made good faith improvements. That entity has the right to recover for those improvements. That is not the case at all. This is a tenant at Sufferance who refused to leave and sat in the property from 2012 all the way to 2017 and never paid the mortgage, never tendered the amount due to upset this foreclosure case, which she did not file a wrongful foreclosure case. She never paid the taxes. She never paid the insurance. They were all paid by EMI for five years. EMI compromised its damaged claim by agreeing to accept the HUD values when Lombardi stated in the deposition that $2,500 a month was the fair rental value. But in order to get this closure on this case in a third summary judgment, our client agreed to go to the lesser amount. There could have been far greater damages in this case had it gone to a jury trial, which the trial judge canceled because there really was no dispute. So I believe that the other argument why that statute doesn't apply is because when you file a Triple T case, the damages in a Triple T case are determined by the Texas Rules of Civil Procedure, and that rule is 783F, and that rule allows the party who is losing the rental to recover that rental value, and that rental value is based on temporary damages based on trespass, which is the coin match case and others from the Texas Supreme Court. The last argument I do want to address, this is an important issue, is the argument we made of being a subsequent purchaser. Mr. Peacock said that we were not a good faith purchaser, but we purchased after foreclosure. The purchaser at the foreclosure was Bank of America. The purchaser nine months later roughly was EMI, one removed. Now, Texas longstanding law on that issue has been a case called slaughter versus is the slaughter case that holds that. In that instance, you're a subsequent purchaser for value because you took in good faith, and it would be inequitable for the mortgage, or in this case, to prevent that status. And that is based on estoppel, not on the good faith purchaser argument. That slaughter case was, as the appellant points out, distinguished in the Texas transportation case, but I'll point out that slaughter should have never been cited by the appellant in the Texas transportation case. Slaughter is a longstanding rule. It's been there. It's been argued, and it is good law. Texas transportation says it's dicta, but it's good dicta because it should have never been cited in that case to begin with because Texas transportation was not a wrongful foreclosure case. It was an attempt to overturn a judgment, and everybody knows the judgment of record. You're on notice of what is of record, and you can't say you're a good faith purchaser of a judgment that is of record. In this case, the foreclosure deed is of record, but on its face you can't determine that there's an error in it. And by the mortgagee, being Ms. Lombardi, providing the authority of the trustee to foreclose the property, that stops her from later trying to contest the title as to someone who has purchased subsequent to the foreclosure sale. So this concept of slaughter, I believe, is still very much alive when it's applied in the circumstances in which it's intended to apply, but certainly not in a case like Texas transportation. I don't believe that they made that argument either, although they argue we're not a good faith purchaser. Slaughter mentions good faith, but I do not believe that that claim is before the court either. For those reasons, we'd ask the court to sustain the findings of the trial judge. All right. Thank you, Mr. Cockrell. All right. For rebuttal, I'm going to ask you to pronounce your name again because I know that Mr. Peacock said it, but let's be sure we get it right. Yes, Your Honor. I'm David Vereeke. Vereeke? All right. Vereeke, V-E-R-E-E-K-E-R. Your Honors, may it please the Court, I'm here for Gene Lombardi, and I'd like to talk first about this waiver business. Did we waive waiver at the trial court? And the defendant was saying that, well, you were talking about waiver of some future event. Why would we argue that at all? That doesn't help us any. It's whether they waived the acceleration in May of 2012. That's the issue. And if you look at the Boren case, the Boren case clearly says if there are acts inconsistent with acceleration by the mortgage company or the servicing company, then the mortgage company unilaterally waives or abandons the previous acceleration. So if that's true, what happens then is the note goes back to its original terms. And we're arguing that's what happened here, that the mortgage company, BOA, waived their acceleration by doing a loan modification. Now, there's another statute here that I'd like to talk about that I think has been touched on. This is Article 52002. And this is where the mortgage company has to give the homeowner the right to cure. And the number has to be good for 20 days, if you look at 51.002D. This was, I took the deposition of the corporate representative in this case, and I have some of the questions that I asked the corporate representative in the brief. And we went through the number that it would take to get the mortgage up to date, and it was around $4,200, something of that nature. And I kept asking if they had, if she paid that, you know, you gave her, the statute gives her 20 days, was that the number? And the corporate representative waffled on that and finally said, well, if she had paid it plus fees, interest, any other monthly payments that were due, and the number was never given to her as far as a specific number that was good for 20 days. And I bring this up because it's emblematic of the runaround that Mrs. Lombardi got through this whole process. 51.002D talks about this 20-day period as for a residence. The law makes a big distinction about whether a property is a residence or not, or just a rental property. If it's a residence, it has a little higher place in law. Not only that, but during this process, the foreclosure took place the latter part of 2012. This was nine months, nine months after her husband died. This was a grieving widow trying to keep her home, dealing with Bank of America, where they set foreclosure, then they cancel it, set foreclosure, then they cancel it. This poor woman was going through grief for her husband and having to try to deal with a company that was pulling the rug out from under her constantly. And then finally at the end, the foreclosure is set, and she's calling, calling, calling. You saw her affidavit in our papers where she's calling, calling, calling. She can't get anybody. The foreclosure is coming up November 7th of 2012, and nobody will talk to her until after the foreclosure. And in criminal law, there's something called the Miranda warning. And I know a mortgage company doesn't have to give a Miranda warning to a homeowner that if we're not going to cancel this one, you better get to a lawyer and get help. None of that was done to this grieving widow. Your Honor, we ask that this case be remanded to the trial court, that the foreclosure be set aside, and that we are able to get damages under the tax and debt collection law. Thank you, Your Honor. Thank you, Mr. Brieke. And your case is under submission.